UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MARIE K.,                                    )
                                             )
                Plaintiff,                   )
                                             )
        v.                                   )        Case No. 2:17-cv-00071
                                             )
NANCY A. BERRYHILL,                          )
Acting Commissioner of                       )
Social Security,                             )
                                             )
                Defendant.                   )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE COMMISSIONER'S DECISION AND DENYING THE
COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 9 & 15)

Plaintiff Marie K. is a claimant for Social Security Disability Insurance ("SSDI")

benefits under the Social Security Act. She brings this action pursuant to 42 U.S.C.

§ 405(g) and moves to reverse the decision of the Social Security Commissioner (the

"Commissioner") that she is not disabled.[1] The Commissioner moves to affirm. The

court took the pending motions under advisement on February 10, 2018.

After her SSDI application was initially denied by the Social Security

Administration ("SSA"), Administrative Law Judge ("ALJ") Thomas Merrill found

Plaintiff ineligible for benefits based on his conclusion that she can perform her prior

work as a housekeeper and was therefore not disabled at any time after her alleged onset

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than 12
months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental
impairment or impairments" must be "of such severity" that the claimant is not only unable to do
any previous work but cannot, considering the claimant's age, education, and work experience,
engage in any other kind of substantial gainful work which exists in the national economy. 42
U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

date of June 1, 2012. ALJ Merrill also concluded that Plaintiff is capable of performing other jobs which exist in significant numbers within the national economy, and therefore concluded that she was not disabled within the meaning of the Social Security Act on this basis as well.

Plaintiff identifies three errors in the disability determination: (1) the ALJ erred in concluding that Plaintiff is not illiterate; (2) the ALJ erred by discounting the opinion of Plaintiff's treating physician without good reasons; and (3) the ALJ erred in determining that her mental health impairments were not severe under the Social Security Act.

Plaintiff is represented by D. Lance Tillinghast, Esq. The Commissioner is represented by Special Assistant United States Attorneys Jeremy A. Linden and Kristina D. Cohn.

## I. Procedural History.

Plaintiff filed an application for SSDI benefits with the SSA on August 1, 2013. Her application was initially denied on September 18, 2013 and again on reconsideration on December 18, 2013. Plaintiff timely requested a hearing before an ALJ on January 2, 2014.

On June 24, 2015, ALJ Merrill presided over Plaintiff's hearing from Manchester, New Hampshire. Plaintiff testified at the hearing from Saint Johnsbury, Vermont, where she appeared together with her attorney. Vocational Expert ("VE") Lynn Paulson also testified. On September 14, 2015, ALJ Merrill issued a written decision finding Plaintiff ineligible for benefits.

Thereafter, Plaintiff filed a request for review with the SSA's Office of Disability Adjudication and Review Appeals Council ("Appeals Council"), which denied her request on February 24, 2017. ALJ Merrill's September 14, 2015 determination therefore stands as the Commissioner's final decision.

## II. Factual Background.

Plaintiff was born in 1964 and resides in Woodbury, Vermont. She completed twelfth grade but asserts that she was enrolled in special education classes throughout her primary schooling, has a learning disability, and has difficulty with reading and writing.

She previously worked as a licensed nurse's assistant ("LNA") and a housekeeper, but has not had gainful employment since June 1, 2012.

## A.  Medical History.

Plaintiff alleges a disability onset date of June 1, 2012.  Prior to that date, on October 23, 2009, she was involved in a motor vehicle accident during which she was rear-ended.  She was transported by ambulance to Copley Hospital, where she complained of back and neck pain.  Physical examination revealed diffuse tenderness in both her back and neck, but reflected otherwise normal sensation, motor function, and mental status.  X-rays of her cervical and lumbar spines were normal with no evidence of fracture.  The attending radiologist observed "subtle narrowing of the L4-5 and L5-S1 disc interspace.  There is a grade I L5 on S1 spondylolisthesis. . . which appears to be chronic." (AR at 349.)  An emergency room physician described Plaintiff's symptoms as a "vague neck ache[,]" (AR at 347), and his clinical impression was that Plaintiff suffered from a neck and lower back strain.  Upon discharge, Plaintiff was prescribed Vicodin for her pain.

Following her October 2009 motor vehicle accident, Plaintiff attended thirty-four physical therapy appointments at Copley Hospital Rehabilitation Services between November 3, 2009 and June 22, 2010.  At her initial physical therapy evaluation, Plaintiff explained that her vehicle was hit by a Green Mountain Power truck at approximately fifty miles per hour and that she was taken to the hospital.  She reported that her neck pain had improved in the week and a half following the accident, but that she was still experiencing lower back pain.  She indicated that this pain was exacerbated by walking or standing for long periods, in addition to bending, and that her pain was an eight out of ten at its worst.  She rated her neck pain as a five to six out of ten.  She stated that she experienced difficulty sleeping and was "unable to get comfortable[.]" (AR at 628.)

Physical examination revealed that Plaintiff's posterior cervical spine was tender to palpation, as was her bilateral lumbar paraspinal region.  Her cervical spine range of motion was thirty-five degrees of flexion and five degrees of extension, with forty-five degrees of rotation bilaterally.  Her lumbar spine had forty degrees of flexion, ten degrees

3

of extension, and forty degrees of rotation bilaterally. Plaintiff's physical therapist noted that her "evaluation was limited by [Plaintiff's] pain level" but observed that Plaintiff possessed decreased range of motion and muscle tenderness and exhibited guarding and altered posture. (AR at 630.) Plaintiff was scheduled for biweekly appointments focused on manual therapy and the development of a home exercise program.

On July 29, 2010, Plaintiff saw Mary Flimlin, M.D. at the Spine Institute of New England for a consulting examination following her course of physical therapy. She reported to Dr. Flimlin that she continued to experience pain at the base of her neck which occasionally radiated into her right arm. Plaintiff also indicated that she continued to suffer from pain "in the middle of her back" which "sometimes radiat[ed] up towards [the] thoracic area. It is a level [nine], made worse by walking and pulling, better with ice and cold." (AR at 360.) Dr. Flimlin reviewed an MRI of Plaintiff's cervical spine taken at Copley Hospital which revealed "bilateral neural foraminal narrowing, C5-C6 secondary to uncovertebral and facet joint arthropathy." *Id.* She also noted "an oval-shaped focused T1-2 in the right STRIP muscles above the vallecular, suggestive of thyroglossal duct cyst." *Id.* Physical examination demonstrated Plaintiff's normal gait and ability to heel and toe walk over short distances. She had negative results for straight leg raises and Spurling's sign, and maintained grossly intact strength and sensory function through her upper and lower extremities. "With gentle palpation, [Plaintiff had] tenderness across the back of the cervical spine and splenius capitis[.]" (AR at 361.)

Dr. Flimlin obtained x-rays of Plaintiff's lumbar spine which revealed "grade 1 anterolisthesis of L5 onto S1" which was "stable in flexion/extension." *Id.* There were also "bilateral pars defects" and "findings consistent with some mild degenerative disk at the L3-4 level." *Id.* Dr. Flimlin noted that Plaintiff's clinical examination was "significant for obtunded reflexes increased tone in the gluteal and hamstrings and centralized pain made worse with flexion and extension." *Id.* Despite obtaining imaging, Dr. Flimlin was "unable to determine if this is an acute spondylitic spondylolisthesis." *Id.* She recommended an additional MRI of Plaintiff's lumbar spine, continued physical

4

therapy, and prescribed gabapentin. Dr. Flimlin restricted Plaintiff's lifting to up to 10 pounds.

On August 16, 2010, Plaintiff underwent an MRI at Fletcher Allen Health Care which revealed multilevel degenerative osteoarthritis. The attending radiologist noted facet joint hypertrophic osteophytes and multilevel degenerative disc disease with loss of disc space height and abnormal disc signal. The MRI also confirmed Plaintiff's bilateral pars defects at L5-S1, in addition to a concentric disc bulge at L3-L4 with mild spinal canal stenosis and bilateral neuroforaminal narrowing. At the L4-L5 level, the radiologist noted an "abnormal hyperintense T2 signal" which was "consistent with an annular tear." (AR at 376.) The radiologist's impression was that Plaintiff suffered from multi-level degenerative disc disease with no focal disc herniation but concentric disc bulges at L2-L3, L3-L4, L4-L5, and L5-S1, in addition to mild facet osteoarthropathy and mild spinal canal stenosis at the L3-L4 and L4-L5 levels. Plaintiff met with Dr. Flimlin on September 17, 2010 to discuss the results of her MRI. Dr. Flimlin recommended an epidural steroid injection, however, Plaintiff indicated that she was "experiencing funding issues and [was] unable to pursue this plan." (AR at 364.) Dr. Flimlin noted that Plaintiff had not filled her prescription for gabapentin, but agreed that she would continue with physical therapy and follow up with Dr. Flimlin as necessary.

Plaintiff returned to Dr. Flimlin on July 6, 2011 with "worsening leg pain." (AR at 366.) She reported that the pain was most severe at night, radiating from her "low back to the buttocks, into the side of the thigh and calf." *Id.* Dr. Flimlin observed that Plaintiff "look[ed] uncomfortable[,]" but could easily transition from sitting to standing and possessed a normal gait. *Id.* Physical examination revealed a positive left straight leg raising test with grossly intact strength. Dr. Flimlin noted Plaintiff's prior imaging results and her earlier diagnosis of bilateral pars defects and grade one anterolisthesis at L5-S1, and opined that "there is nerve root traction at this level." *Id.* She counseled Plaintiff on possible treatment options, including medication, injections, physical therapy, acupuncture, chiropractic, and hydrotherapy. Dr. Flimlin also suggested a possible TENS unit trial in combination with axial decompression and lumbar stabilization.

Plaintiff returned to Dr. Flimlin on March 15, 2012, and reported continued pain exacerbated by medial branch block procedures performed in January 2012. Dr. Flimlin noted that an epidural steroid injection provided Plaintiff with twenty-five percent relief for approximately two to three weeks. Dr. Flimlin noted that Plaintiff had not attended physical therapy in the past six months and was not exercising on a regular basis. Physical examination revealed that Plaintiff could transition easily from sitting to standing and possessed a "relatively normal" gait. (AR at 368.) Lumber flexion and extension caused Plaintiff pain, as did lateral bending and rotation. She possessed grossly intact strength with the exception of her left hip flexor, as well as grossly intact sensory function. A SPECT/CT scan confirmed Plaintiff's prior diagnoses and indicated "increased uptake in the pars on the right at L5. There [was] also significant facet arthropathy L3-4 with increased uptake." *Id.* Dr. Flimlin suggested additional epidural steroid injections which Plaintiff declined.

In January 2013, Plaintiff began another course of physical therapy at Copley Hospital. At her intake assessment on January 7, 2013, Plaintiff's gait, reflexes, balance, and coordination were observed as normal. Her lumbar spine, however, was "hypersensitive" to palpation and her range of motion was decreased. (AR at 322.) Plaintiff's physical therapist noted that she had "limited ability to perform A[ctivities of ]D[aily ]L[iving], difficulty sleeping, and endurance." *Id.* The therapist concluded that Plaintiff would benefit from electrical stimulation, trial of a TENS unit, manual therapy, and therapeutic home exercises. Following her intake assessment, Plaintiff attended ten physical therapy sessions prior to her discharge on April 16, 2013.

On March 15, 2013, Plaintiff saw Dr. Flimlin for an annual follow-up appointment. At this visit, Plaintiff reported that her pain was now exclusively in her back and rated it an eight out of ten. She had been attending physical therapy prior to her appointment, and indicated that she found it helpful. Plaintiff again declined additional epidural steroid injections and instead elected to continue with physical therapy and stretching. Dr. Flimlin prescribed a trial dose of Meloxicam.

On October 30, 2013, Plaintiff began mental health counseling at Hardwick Health Center ("HHC") with Kate M. Culver, a licensed clinical social worker. At this initial appointment, Plaintiff reported that she could not "stop crying" and that she desired to "get where I'm not crying all the time." (AR at 487.) She stated that she did not "understand why [she felt] this way." *Id.* Ms. Culver observed Plaintiff's depressed mood and tearful affect, but noted that Plaintiff had no problems with thinking or cognition. Plaintiff's recent experience of multiple deaths of individuals close to her and the loss of her prior work as a care provider were cited as possible sources of her depression. Ms. Culver diagnosed Plaintiff with a depressive disorder not otherwise specified in the Diagnostic and Statistical Manual and assessed her prognosis as fair.

Plaintiff saw Ms. Culver again on January 8, 2014. At this visit, Ms. Culver recorded that Plaintiff "present[ed] with moderate to severe depressive symptoms." (AR at 519.) Plaintiff reported that she did not "do much[,]" that she did not "really leave the house[,]" and that she experienced isolation, as well as diminished energy and motivation. *Id.* Ms. Culver observed Plaintiff's depressed mood, blunted affect, and depressed thought processes. She indicated, however, that Plaintiff had no "[c]ognition problems[.]" *Id.* Plaintiff expressed a desire to "connect" with vocational rehabilitation services, in part due to anxiety stemming from learning challenges including difficulty reading and writing.

On January 16, 2014, following Plaintiff's appointment with Ms. Culver, she saw her primary care physician at HHC, Peter Sher, M.D. for additional care related to her depression, back pain, and diabetes. Dr. Sher began his subjective assessment with the observation that Plaintiff was "more depressed than [he] had thought," (AR at 517), an observation based on Ms. Culver's note reflecting that Plaintiff almost never left her home. Dr. Sher observed that "anxiety, sadness, [and] back pain" were contributing factors to Plaintiff's inability to leave her home, noting that physical therapy did not "really help" her back problems. *Id.* Dr. Sher's progress note reflected Plaintiff's history of hypertrophic cardiomyopathy, endometrial adenocarcinoma, grade I spondylolisthesis, and illiteracy. Physical examination revealed mild diffuse tenderness over Plaintiff's

back. Dr. Sher expressed a desire to "start her on Cymbalta" but he was "fairly certain her insurance [would not] pay for it." (AR at 518.) He therefore prescribed sertraline to treat her depression which in turn would positively impact her pain and her history of poorly controlled diabetes. He indicated that Plaintiff's plans to pursue vocational rehabilitation were a positive development. He increased Plaintiff's insulin dosage and refilled her prescription.

On June 10, 2014, Plaintiff saw Dr. Sher who recorded symptoms of dyspnea on exertion and generalized fatigue, blood glucose levels in excess of normal limits, and back pain which occasionally radiated into her lower legs. The results of a physical examination were normal. With regard to Plaintiff's elevated blood sugar levels, Dr. Sher opined that he thought she was "not cognitively capable to self[-]titrate [her insulin medication.]" (AR at 553.) He noted that there were "[r]ecords documenting [her illiteracy] dating to high school [but] they are no longer available." *Id.* He "encouraged her to see a counselor who could help objectively confirm this for disability, as well as to see [physical therapy] for functional evaluation." *Id.* He further opined that "given [Plaintiff's] multiple medical problems, pain, and cognitive limitations, she is unable to work." *Id.*

On July 10, 2014, Juliann R. Ambroz, M.Ed., a licensed clinical mental health counselor, authored a letter wherein she reported that Plaintiff began mental health treatment with her on June 17, 2014 and attended appointments on a weekly basis. Ms. Ambroz recorded that Plaintiff cited depression and anxiety as reasons for obtaining treatment and explained that her back and leg pain prohibited her from doing her prior work as a LNA. Ms. Ambroz also noted that Plaintiff "indicated that she has a learning disability of unknown type and the she is unable to read or write. This fact also affects her search for employment." (AR at 560.) Plaintiff related to Ms. Ambroz that she "used to enjoy work and seem[ed] eager for Voc[ational] Rehab[ilitation] to find her meaningful employment." *Id.* Ms. Ambroz opined that "[i]f vocational Rehabilitation can find appropriate work for [Plaintiff], this could be quite useful for her." *Id.*

On August 13, 2014, Dr. Sher treated Plaintiff for her diabetes and back pain. His progress notes from this appointment acknowledged that Plaintiff was "seeking disability" at the time of her visit, and had reported that "they do not believe that she is illiterate." (AR at 567.) He asserted in the note, however, that Plaintiff "has been illiterate for her whole life and has been coming here for a long time. She was in special education classes, and I do not think she can learn to read." *Id.*[2] Dr. Sher further recorded Plaintiff's history of back pain and diabetes. On August 13, 2014, he completed a rehabilitation medical request form which diagnosed Plaintiff with "back pain" and "illiteracy[.]" (AR at 562.) Dr. Sher indicated that he was not qualified to assess Plaintiff's functional limitations with regards to her ability to work, but opined that she could not perform physical labor or read and was unlikely to be able to do so.

On August 16, 2014, Vermont Rehabilitation Services ("VRS") certified that Plaintiff's "disabilit[ies] result[] in a substantial impediment to employment[.]" (AR at 601.) On October 10, 2014, she attended an appointment with a VRS counselor who "read [a document] aloud to [Plaintiff] and asked if there was someone at home that could help her with filling it out." (AR at 602.) She also inquired if someone could assist Plaintiff in completing a resume outline, "due to her [learning disability] in reading and writing." *Id.*

On October 14, 2014, Plaintiff visited the Fletcher Allen Health Care Center for Pain Medicine. Kristie Oliver, P.A.-C evaluated Plaintiff under the supervision of a medical doctor, and noted that Plaintiff had last visited the Center for Pain Medicine in January 2012 when she received a medial branch block. Plaintiff complained of pain radiating down her leg and thigh as well as across her lower back, and reported that she had not found any treatment that improved her symptoms. She further reported that climbing stairs exacerbated her pain. Physical examination revealed a mildly antalgic gait but no difficulty rising from a seated position. Plaintiff could walk without an

---

[2] A letter from the registrar at Lamoille Union High School states that Plaintiff was enrolled there in a program called "Community Based[,]" but no records or transcripts of her education are available. *See* AR at 289.

assistive device. Because Plaintiff was "a poor historian and [was] unable to provide an accurate medication list[,]" Ms. Oliver "discussed a variety of medication recommendations" in addition to possible conservative measures that might address Plaintiff's symptoms. (AR at 586.) Ms. Oliver also recommended that Plaintiff resume physical therapy and consider a Flector patch.

On December 29, 2014, Plaintiff visited Dr. Sher for management of her diabetes, which remained poorly controlled, as well as for her chronic pain. He noted that Plaintiff's mood was improved and that Flexeril had eased her leg pain, but she had a positive straight leg raising test on her left side at ninety degrees. A physical examination was otherwise normal. Dr. Sher indicated that Plaintiff was interested in resuming physical therapy. He increased Plaintiff's insulin dose, "cautiously" increased her Flexeril dose, and referred her to physical therapy.

On January 6, 2015, Ms. Ambroz provided an "updated treatment summary" of Plaintiff's counseling for the period between July 11, 2014 and the date of her letter. During that time period, Plaintiff attended fourteen therapy sessions, after which Ms. Ambroz diagnosed her with "Trauma and Stressor Related Disorder[.]" (AR at 624.) She identified a number of traumatic events underlying Plaintiff's symptoms. Ms. Ambroz noted that Plaintiff was unable to read or write and that she reported "a learning disability of 'unknown type.'" *Id.* Ms. Ambroz further noted that Plaintiff had not returned to VRS since her October 2014 counseling session and suggested that Plaintiff schedule an appointment for additional assistance. By January 30, 2015, Plaintiff "reported a stable mood and relative satisfaction with her personal relationship[s]. She felt that she had met the treatment goals that had brought her to therapy (grief, depression[,] and anxiety)." (AR at 703.) Consequently, Ms. Ambroz discharged Plaintiff from her care.

Beginning in January 2015, Plaintiff resumed physical therapy at Copley Hospital's Rehabilitation Services. At the time of her initial assessment, Plaintiff reported that her pain was seven out of ten, and that standing or walking for more than five minutes at a time increased her symptoms to ten out of ten. The physical therapist

noted that Plaintiff could independently perform her ADLs and care for her disabled grandson. A physical examination revealed deficits in Plaintiff's gait and posture, limited range of motion in her back, and a positive straight leg raising test on her left side. Plaintiff's back was tender to palpation across her left piriformis, posterior thigh, and the spinous processes at L1 through L5. The physical therapist concluded that Plaintiff had a "[g]ood" prognosis and established a plan including therapeutic exercises, neuromuscular reeducation, manual therapy, gait training, and aquatic therapy if appropriate. (AR at 658.) At a reevaluation on February 13, 2015, following six treatment sessions, Plaintiff reported additional symptoms, including pain in her neck, left shoulder, and left arm. Her physical therapist concluded that these symptoms were the result of a "left upper trapezius muscle strain from poor posture[,]" but maintained that Plaintiff's prognosis remained "[g]ood." (AR at 680.)

On February 19, 2015, a counselor at VRS performed a Kaufman Brief Intelligence Test ("K-BIT II") which revealed Plaintiff's verbal score of 63 and nonverbal score of 40, both of which were categorized as being in the "lower extreme." (AR at 298.) Plaintiff's composite IQ was 50, which also fell "in the lower extreme range." *Id.* Throughout the administration of the test, Plaintiff reported that "she had no idea what the words meant, so [] she was just going to guess, nor could she understand the patterns of pictures in the nonverbal portion[.]" *Id.*

On March 12, 2015, Plaintiff returned to Dr. Flimlin, who noted that she had not seen Plaintiff since 2013. Dr. Flimlin documented that Plaintiff's physical therapy and use of TENS unit was "helpful in controlling her left leg pain." (AR at 677.) On physical examination, Plaintiff could easily transition from sitting to standing and could heel and toe walk, but she exhibited mild forward flexion at the waist while walking. Her forward flexion was somewhat limited, as was her lumbar extension. Plaintiff had negative straight leg raising tests, a normal sensory examination, and no limitation in her ability to bend or rotate laterally. Dr. Flimlin's assessment was that Plaintiff "was doing rather well[,]" and noted that stretching and physical therapy were useful. *Id.*

Subsequently, on March 23, 2015, Dr. Sher referred Plaintiff for an additional MRI. Joseph S. Pekala, M.D. recorded early degenerative facet disease in Plaintiff's cervical spine, and identified "a broad disc osteophyte complex effacing the CSF space and degenerative fact disease with ligamentum flavum hypertrophy causing moderate spinal canal narrowing" at C4-C5. (AR at 691.) He also noted "severe left neural foraminal narrowing and mild/moderate right neural foraminal narrowing" at this location. *Id.* Dr. Pekala recorded similar findings at the C5-C6 level, and observed "early degenerative facet disease and mild bilateral neural foraminal narrowing" at the C6-C7 level. *Id.* Dr. Pekala's overall impression was that of multilevel cervical spine degenerative disc and facet disease.

Four days later, on March 27, 2015, Dr. Sher observed that Plaintiff continued to suffer from back and neck pain which was unresolved through her current medication and physical therapy regime. He prescribed Vicodin and had a nurse "read her the pain contract because she is illiterate." (AR at 699.) Dr. Sher noted that Plaintiff's diabetes remained poorly controlled, primarily because she often forgot to take her medications.

**B. Plaintiff's Function Reports.**

On or about November 6, 2013, Plaintiff submitted a Function Report in connection with her application for SSDI benefits which was completed by her attorney. Plaintiff indicated that, "[d]ue to back and leg pain, I have difficulty standing, walking, sitting, bending, kneeling, climbing stairs, lifting, etc." (AR at 246.) She reported that she uses a ramp to enter her mobile home and has difficulty climbing the stairs. She also reported that she cannot spell or read well and has difficulty following instructions. Prior to her motor vehicle accident, Plaintiff could work full time and take care of her children.

Plaintiff reported that she begins her day between six and nine a.m., drinks coffee, watches television, and then showers. She prepares her own simple meals and occasionally performs light housework including sweeping, dishwashing, dusting, and laundry. She typically goes to bed between ten and eleven p.m., but indicated that her back pain occasionally makes falling asleep difficult. Plaintiff stated that she sometimes forgets to take her medication in the morning, and her doctor has recommended placing

the bottles in a prominent position as a reminder. She stated that she goes outside daily, both on foot and in a car, and that she shops for groceries while she is out.

Plaintiff affirmed that she is able to pay bills, count change, handle a savings account, and use a checkbook. Her hobbies including watching television and reading newspapers. She speaks with family members on the telephone and visits with her daughters, grandchildren, and sister multiple times per week.

With regards to her functional capacities, Plaintiff asserted that her impairments impact her ability to perform a wide range of postural activities, and that she can only lift five to ten pounds frequently, fifteen pounds occasionally, stand for fifteen to thirty minutes at a time, and sit for half an hour in the same position. She identified challenges with her memory affecting her ability to complete tasks, concentrate, understand, and follow instructions. She stated that she can pay attention for between one half and one hour, only "sometimes" finishes what she begins, and occasionally requires assistance reading a recipe. She indicated that she does not handle stress or changes in routine well.

### C. Consulting Assessments.

On or about September 12, 2013, Fred Rossman, M.D. performed a consulting physical examination in connection with Plaintiff's application for SSDI benefits. He noted Plaintiff's history of diabetes, hypertension, and back and neck pain stemming from the 2009 motor vehicle accident. Plaintiff reported her back pain as a typically steady five out of ten with occasional increases to seven or eight out of ten. She further reported that she was unable to walk more than 1,000 feet and could not sit or stand for longer than thirty minutes. Plaintiff was able to walk in and out of the office, including climbing and descending ten steps without an assistive device, and was able to sit during the interview and move around the office as requested. Dr. Rossman observed that Plaintiff was cooperative throughout his examination and was able to perform most activities "without signs of significant distress or pain[.]" (AR at 479.)

Dr. Rossman recorded minimal tenderness in Plaintiff's mid-lower back, the ability to rotate her head seventy degrees to the right and left with minimal discomfort, normal extension in her cervical spine, normal flexion forward in her lumbar spine, and

13

diminished lateral flexion to the right and left with pain in her lower back. He assessed Plaintiff's forward shoulder flexion and abduction to be normal and observed that she could raise her hands above her shoulder and lower them below her waist. Plaintiff had a positive straight leg raising test on the right leg and negative on the left leg, with normal knee flexion and extension. Plaintiff also possessed decreased deep tendon reflexes bilaterally in her knees. Dr. Rossman noted Plaintiff's normal, non-antalgic or ataxic gait, ability to heel and toe walk without difficulty, and intact sensation and motor strength throughout her upper and lower extremities.

On or about September 17, 2013, Ellen Atkins, Ph.D. completed a consulting psychological assessment in connection with the initial review of Plaintiff's application for SSDI benefits.[3] Dr. Atkins provided her assessment of Plaintiff's mental residual functional capacity ("RFC") but did not complete a Psychological Review Technique ("PRT") form because she concluded that Plaintiff did not suffer from any severe mental impairments. She reviewed Plaintiff's function report which reported difficulty with reading and spelling and noted Dr. Sher's observations that Plaintiff struggled with illiteracy and was previously diagnosed with a learning disability.

Dr. Atkins noted that Plaintiff did not have any difficulty interacting with doctors, participating in examinations, or providing consent. She further observed that Plaintiff had no difficulty completing her ADLs and indicated on her function report that she could concentrate for between one half and two hours. She concluded that "the objective evidence and the function [report] do not suggest the presence of a severe mental impairment." (AR at 71.)

On or about November 8, 2013, Elizabeth White, M.D. performed a consulting physical assessment as part of the reconsideration of Plaintiff's application for SSDI benefits. Dr. White evaluated the evidence in the record, making note of Plaintiff's October 2009 x-ray, June and August 2010 MRIs, September 2011 CT scan, and Dr. Rossman's consulting examination from September 2013. Dr. White also indicated her

---

[3] Dr. Atkins's review of Plaintiff's medical record occurred prior to Plaintiff's first mental health counseling appointment, which was with Ms. Culver on October 30, 2013.

14

review of Dr. Sher's treatment notes. She concluded that Plaintiff's diabetes and high blood pressure did not create significant limitations and were therefore not severe impairments. With regard to Plaintiff's back and neck pain, Dr. White concluded that "cervical and lumbar pathology, with pain, exacerbated by obesity, with exams as noted, . . . limited [Plaintiff] to [l]ift/[c]arry 20 lbs/10/lbs, [w]alk/[s]tand for 6 hours and [s]it 6 hours[.]" (AR at 84.) She further concluded that Plaintiff is "capable of performing at this level on a sustained basis for normal work days/weeks." *Id.* Dr. White stated definitively that "[n]o physical condition limits [Plaintiff] further." *Id.*

On or about November 14, 2013, Jason H. Fechter, Ed.D., a licensed psychologist, performed a consulting psychological examination of Plaintiff. Dr. Fechter noted that Plaintiff had not worked for one year prior to the evaluation due to worsening back and leg pain associated with the 2009 motor vehicle accident. Plaintiff reported "feeling sad lately and struggling with episodes of spontaneous crying. She miss[ed] her job and the people she used to care for." (AR at 500.) She informed Dr. Fechter that her feelings of sadness were new to her and of an unknown origin. She mentioned occasional difficulty sleeping, but did not report any problems with anxiety. Plaintiff also related no difficulty performing ADLs, including cooking, cleaning, doing laundry, paying bills, and driving.

With regard to mental status and cognitive function, Plaintiff received a score of 23 on the Mini Mental State Examination-2 (SV) ("MMSE-2") scale, which Dr. Fechter classified as below average and indicative of cognitive impairment. He observed Plaintiff's appropriate dress and affect, her cooperation with the interview, and her depressed mood. Plaintiff spoke softly and possessed a shuffling gait. Dr. Fechter recorded intact thought processes with no hallucinations or delusions, and no sign of suicidal ideation. He also noted that Plaintiff's memory was intact and that there was no impairment in her self-perception. Dr. Fechter's primary diagnosis was chronic adjustment disorder with depressed mood. He listed chronic pain, unemployment, and inadequate finances as further challenges and assigned Plaintiff a Global Assessment

Function ("GAF") score of 55.[4]

On or about December 18, 2013, Joseph Patalano, Ph.D. conducted a consulting psychological assessment in connection with the reconsideration of Plaintiff's SSDI benefits application. Dr. Patalano reviewed Dr. Fechter's consulting examination report, completed a PRT form, and provided an updated mental RFC. He concluded that Plaintiff "appears to have chronic depression which has been intensified with medical condition and not working. She may have some mild cognitive impairment associated with depression. He[r] ADLs are strong." (AR at 84) (capitalization omitted). Dr. Patalano's PRT entries reflected his assessment that Plaintiff suffered from only mild restriction in her ADLs and ability to maintain social function, moderate difficulty maintaining concentration, persistence, or pace, and had experienced no extended episodes of decompensation. With respect to Plaintiff's mental RFC, he assessed that she "may have episodic[] problems with concentration/pace due to episodic increases in depression associated with health and environmental stressors[.] Otherwise from a psych[ological] perspective, [she] can sustain concentration/persistence/pace for 2 hour periods over [an] 8 hour day through [a] typical work week." (AR at 89) (capitalization omitted).

---

[4] The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (alteration in original) (quoting Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereafter "DSM-IV")). GAF scores rate the overall psychological functioning of an individual on a scale of zero to 100, *see Scott v. Colvin*, 2016 WL 5173252, at *6 n.6 (E.D.N.Y. Sept. 21, 2016) (citing DSM-IV (text revision) at 34), and are assessed using a scale that provides ratings in ten ranges, with higher scores reflecting greater functioning. *See Corporan v. Comm'r of Soc. Sec.*, 2015 WL 321832, at *12 n.9 (S.D.N.Y. Jan. 23, 2015). A score of fifty-five indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *Anair v. Colvin*, 2015 WL 5089316, at *9 n.9 (D. Vt. Aug. 26, 2015) (alteration in original, internal quotation marks omitted). "[T]he utility of [a GAF score] is debatable, particularly after its exclusion from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Berry v. Comm'r of Soc. Sec.*, 2015 WL 4557374, at *3 n.10 (S.D.N.Y. July 29, 2015) (capitalization omitted).

### D. Testimony at the ALJ Hearing.

At the June 24, 2015 hearing before ALJ Merrill, Plaintiff testified that she was unsure about the status of her medical records because she does not "know how to read and write very well." (AR at 48.) She similarly stated that she was unsure of her alleged onset date because she is "not good with the dates." *Id.* Plaintiff testified that she was "in special ed" during high school because she "was having a hard time learning." (AR at 49-50.) She described her present ability to read and write as significantly limited and explained that she was able to obtain her LNA certification through memorization of the relevant material and the assistance of another person who read the examination to her. She also stated that she had the assistance of a tutor in preparing for the test. She explained that she is unable to navigate the internet without assistance and that she has trouble remembering and concentrating, and difficulty understanding "how to test [her] sugar levels and how to take the right medications[.]" (AR at 57.)

With regards to her physical impairments, Plaintiff testified that she has back pain every day which is occasionally severe enough to preclude her from "get[ting] out of bed in the morning." (AR at 52.) She stated that approximately three to four months prior to the hearing, she began taking a narcotic pain medication which was "helping [her] out." *Id.* When her pain was particularly acute, she was forced to lie down for approximately three to four hours. She explained that when shopping, she holds onto a shopping cart to steady herself and is limited to two trips up and down the length of a mall by her leg pain. She stated that she is limited in her ability to hold her arms above her shoulders, and can only lift approximately ten pounds. When asked by her attorney if she could lift ten pounds for between four and six hours per day, Plaintiff responded "probably not. No." (AR at 56.) Likewise, Plaintiff can only sit for between one half and one hour before needing to "get up and walk around[.]" *Id.* Plaintiff further testified that she cannot stand in one place for more than ten minutes and has difficulty bending and kneeling. She explained that she cannot drive long distances because of back pain. At the time of the hearing, Plaintiff stated that she was approximately five feet tall and weighed 174 pounds.

Following Plaintiff's testimony, the VE categorized Plaintiff's work history as most closely aligned with the definitions of the following positions within the Dictionary of Occupational Titles ("DOT"): Nurse's Aide (DOT 355.674-014); Personal Care Aide (DOT 354.377-014); and Housekeeper (DOT 323.687-014). The VE testified that Plaintiff's work as a nurse's aide and a personal care aide was performed at the "[m]edium exertional level" and her work as a housekeeper was performed at the "[l]ight exertional level." (AR at 62.)

When presented with a hypothetical individual with a twelfth grade education, Plaintiff's work history, the ability to lift twenty pounds occasionally and ten pounds frequently, the ability to sit for six hours, and the ability to perform a wide range of postural activities at least occasionally, the VE testified that such an individual could perform Plaintiff's past work as a housekeeper. The VE further testified that such a hypothetical individual could also perform the representative occupations of a merchandise marker, small product assembler, or a gate attendant. The VE explained that each of those positions exists in significant numbers within the national economy. In response to a clarifying question from the ALJ, the VE explained that a hypothetical individual limited to tasks involving between one and three step instructions could perform both Plaintiff's prior work as a housekeeper and the representative occupations.

Plaintiff's attorney asked the VE whether an individual with limited ability to read could perform the representative occupations. The VE answered that, pursuant to the DOT definition, "these are all not jobs that require much in the way of reading ability[,]" (AR at 64), and that an illiterate individual would not be able to perform the representative occupation of price marker, but could perform the role of product assembler. The VE also stated that an individual who could not sit, stand, or walk for a total of six hours per day would not be able to perform any of the representative occupations. Similarly, an individual limited to using his or her left upper arm only occasionally could not perform the representative occupations.

18

## III. ALJ Merrill's Application of the Five-Step, Sequential Framework.

In order to receive SSDI benefits, a claimant must be disabled on or before his or her date last insured. SSA regulations set forth the following five-step, sequential framework to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Merrill concluded at Step One that Plaintiff had not engaged in substantial gainful activity since June 1, 2012, her alleged onset date. At Step Two, he concluded that Plaintiff had the severe impairment of degenerative disc disease of the lumbar spine. In so finding, ALJ Merrill concluded that Plaintiff's diabetes was not severe because there was no medical opinion establishing its severity and Plaintiff's medical records related to high blood sugar "document only compliance issues." (AR at 26.) For similar reasons, he concluded that Plaintiff's high blood pressure was not severe.

ALJ Merrill found that Plaintiff did not have a learning disability and "is not illiterate[.]" (AR at 27.) In support of this conclusion, ALJ Merrill first noted the lack of

school records establishing Plaintiff's placement in special education classes, the lack of a medically diagnosed learning disability, and Dr. Atkins's consulting assessment which found that Plaintiff did not have any severe mental impairments. ALJ Merrill also observed that a Job Screening Questionnaire completed by Plaintiff's last employer found her competent to handle even some complex cases as a nurse's assistant. In addition, ALJ Merrill cited a consulting vocational assessment conducted by John May, MA CRC, ABVE, a certified rehabilitation counselor licensed in Vermont, in connection with a civil lawsuit arising out of the 2009 motor vehicle accident. Mr. May indicated that Plaintiff "reported some difficulties with reading and writing, [but] she stated that she never received a diagnosis of learning disability. She stated that she was an average student in high school." (AR at 719.)

ALJ Merrill discounted Dr. Sher's progress notes which reflected Plaintiff's alleged illiteracy, in part because Dr. Sher first indicated Plaintiff's illiteracy in a May 7, 2013 treatment note, approximately three months before Plaintiff's August 1, 2013 disability application. Dr. Sher's earlier treatment notes, however, did not reflect any reading or writing difficulties. ALJ Merrill found that "there are no barriers to learning noted throughout the record." (AR at 26.) As a result, he concluded: "the treating source opinion of Dr. Sher, the claimant's primary care [physician], that the claimant is unable to work given the claimant's multiple medical problems, pain, and cognitive limitations is given no weight." (AR at 33.)[5]

---

[5] The ALJ ascribed a potential motive for Plaintiff's treating physician's opinion:

> The possibility always exists that a doctor may express an opinion in the effort to assist a patient with whom he or she sympathizes for one reason or another. Patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(AR at 32.)

Finally, with regard to Plaintiff's depression, ALJ Merrill found that Plaintiff's "medically determinable mental impairment of depression does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore non[-]severe." *Id.* The ALJ based this conclusion on Dr. Patalano's mental RFC determination which was part of the reconsideration of Plaintiff's SSDI application, in addition to Dr. Fechter's consulting examination. As part of his analysis, the ALJ considered Plaintiff's abilities in each functional category contained within the "paragraph b" criteria of the SSA regulations and concluded that Plaintiff's degenerative disc disease and associated back and neck pain were her only severe impairments.

At Step Three, the ALJ determined that Plaintiff's degenerative disc disease did not meet or medically equal the severity of a listed impairment described at 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered the criteria for listing 1.04, which encompasses disorders of the spine. After reviewing the results of Plaintiff's imaging and her responses in her function report, the ALJ found that "objective clinical findings fail to support the degree of functional limitation contemplated by the listing." (AR at 29.)

At Step Four, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in the SSA regulations, with the exception that she could lift or carry twenty pounds occasionally and ten pounds frequently. She could stand or sit for up to six hours in an eight hour workday, and had unlimited use of her hands and feet to manipulate controls and grasp objects. He also found that Plaintiff was capable of performing a range of postural activities either frequently or occasionally.

To determine Plaintiff's RFC, the ALJ evaluated her subjective complaints regarding her symptoms in light of the objective medical evidence and a series of other criteria delineated in 20 C.F.R. § 416.929(c). ALJ Merrill found that "[t]he objective evidence in this claim falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis." (AR at 30.) In particular, he concluded that Plaintiff's "statements concerning

the intensity, persistence[,] and limiting effects of [her] symptoms are not entirely credible[.]" (AR at 31.)

ALJ Merrill noted that multiple physicians observed Plaintiff's ability to sit, rise to a standing position, dress and undress, and walk up and down steps without a cane or other assistive device. The ALJ also observed that Dr. Rossman's physical examination revealed normal lumbar flexion, full range of motion in Plaintiff's shoulders, and a normal gait. With regards to Plaintiff's MRI results, the ALJ pointed out that although there was evidence of foraminal narrowing and nerve root crowding, "there was no evidence of actual nerve root compression that would explain [Plaintiff's] pain." (AR at 31.) Similarly, the ALJ found that Plaintiff's positive experiences with physical therapy suggested that treatment options existed which, if pursued, would enhance Plaintiff's functional capacity. He also concluded that Plaintiff's ADLs undermined her claim of severe impairment.

In contrast to his evaluation of Dr. Sher's opinion, ALJ Merrill gave substantial weight to the evaluations of the state agency medical consultants who performed non-examining assessments of Plaintiff's medical records in connection with her SSDI benefits application. In particular, he found that Dr. White's assessment that Plaintiff is able to perform work at the light exertional level was supported by objective clinical findings derived from Dr. Rossman's consulting physical examination. The ALJ further noted Plaintiff's report to Dr. Fechter that she could lift twenty pounds.

At Step Four, ALJ Merrill determined that Plaintiff is capable of performing her past relevant work as a housekeeper because it did "not require the performance of work-related activities precluded by [Plaintiff's RFC]." (AR at 34.) He therefore found Plaintiff not disabled at any time after her alleged onset date.

ALJ Merrill made alternative findings at Step Five, concluding that even if Plaintiff is not capable of returning to her prior work as a housekeeper, the Medical Vocational Guidelines (the "Guidelines") found at 20 C.F.R. Part 404, Subpart P, Appendix 2 dictated a finding that Plaintiff is not disabled based on her age and RFC. The ALJ further concluded that, even if the Guidelines did not dictate a finding that

Plaintiff is not disabled, she is capable of performing the representative occupations of merchandize marker, small products assembler, and gate attendant, and thus was not disabled on that basis as well.

IV.   **Conclusions of Law and Analysis.**

   A.   **Standard of Review.**

   In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

   Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

   B.   **Whether the ALJ Erred by Concluding that Plaintiff is not Illiterate.**

   Plaintiff contends that the ALJ erred by concluding that Plaintiff is not illiterate. The court agrees. While ALJ Merrill may have properly found that Plaintiff has not proffered sufficient evidence of her illiteracy, he erred when determined that Plaintiff "is not illiterate" without obtaining the testing the Commissioner concedes is necessary to establish this vocational factor. *See* Doc. 15 at 3 (citing 20 C.F.R. §§ 404.1564, 404.1560(b)-(c); *Young v. Comm'r of Soc. Sec.*, 2012 WL 3249506, at *6 (E.D. Cal. Aug. 7, 2012)). As Plaintiff correctly notes, there is substantial evidence in the record beyond Dr. Sher's treatment notes which suggests that Plaintiff suffers from a cognitive

impairment that affects her ability to read and write. For example, Dr. Fechter performed an MMSE-2 examination which revealed a "below average" score that "suggest[ed] cognitive impairment." (AR at 501.)

To the extent that Plaintiff's medical record did not include a specific diagnosis of any particular learning disability or other cognitive impairment, the ALJ had an obligation to develop the record. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel") (internal quotation marks omitted). While the burden to establish an impairment rests with Plaintiff at Step Two, *Burgess*, 537 F.3d at 128, in this case the absence of such a diagnosis represented an "obvious gap" in Plaintiff's records which merited further investigation. *Rosa*, 168 F.3d at 79 n.5; *see also* SSR 96-8P, 1996 WL 374184, at *5 (Jul. 2, 1996) (the ALJ must "make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC").

"[T]he determination of whether or not a claimant is illiterate can be the deciding factor in determining whether or not a plaintiff is disabled." *Colon v. Astrue*, 2010 WL 2925969, at *2 (W.D.N.Y. Jul. 23, 2010); *see* 20 C.F.R. Part 404, Subpart P, Appendix 2 (establishing literacy as a factor under the medical-vocational guidelines for determining disability). Had the ALJ ordered a consultative intelligence examination, any question as to Plaintiff's cognitive ability would have been resolved. *See Turner v. Comm'r of Soc. Sec.*, 2016 WL 3597788, at *14 (D. Vt. Jun. 27, 2016) (remanding for further development with respect to Plaintiff's "alleged illiteracy" where Plaintiff testified that he could not read or write); *cf. Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013) (summary disposition) (noting that "[i]t can be reversible error for an ALJ not to order a consultative examination when an examination is required for an informed decision" but concluding that "the ALJ was not obligated to order a consultative intelligence examination to supplement the record in response to a few stray remarks unsupported by other record evidence"). The ALJ's failure to develop the record at Step Two is not harmless because it is not "inconsequential to the ultimate nondisability

determination." *Cheeseman v. Berryhill*, 2018 WL 1033226, at \*11 (D. Vt. Feb. 23, 2018) (internal quotation marks omitted). In this case, the record evidence of Plaintiff's cognitive impairment was more than "a few stray remarks" and merited further investigation. *Tankisi*, 521 F. App'x at 32. The ALJ's conclusion at Step Two that Plaintiff "is not illiterate" is not supported by substantial evidence in the record.

## C.  Whether the ALJ Violated the Treating Physician Rule

Plaintiff contends that the ALJ improperly discounted the opinions of her treating physician, Dr. Sher, both when determining her severe impairments at Step Two and when evaluating her credibility as part of the RFC determination. "[T]he SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]" *Burgess*, 537 F.3d at 128 (internal quotation marks omitted).

> Treating source means [the claimant's] own acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]. Generally, we will consider that [the claimant has] an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s).

20 C.F.R. § 404.1527(a)(2). Treating physicians "are likely . . . most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)" and they "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Burgess*, 537 F.3d at 128 (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)). If an ALJ does not accord a treating physician's opinion "controlling weight," he or she is required to give "good reasons" for

the lesser weight assigned. 20 C.F.R. § 404.1527(c)(2); *Burgess*, 537 F.3d at 129. "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even – and perhaps especially – when those dispositions are unfavorable." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). "[F]ailure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted).

If a medical opinion from a treating physician is given less than controlling weight, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the "relevant evidence" provided in support of the opinion, "particularly medical signs and laboratory findings"; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is giving an opinion "about medical issues related to his or her area of specialty"; and (6) any other relevant factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6) (explaining that "[u]nless we give a treating source's medical opinion controlling weight . . . , we consider all of the following factors in deciding the weight we give to any medical opinion").

After reviewing the regulatory framework governing the Commissioner's evaluation of a treating physician's opinion, the ALJ observed that "the opinion of a treating physician that a claimant is unable to work is entitled to no deference at all (as it is not a medical opinion)." (AR at 33) (internal quotation marks omitted). He therefore afforded no weight to Dr. Sher's opinion that Plaintiff's physical and mental impairments precluded her ability to work because it was "an opinion of ultimate disability reserved to the Commissioner." *Id.* The ALJ further found that Dr. Sher's opinion was "based in part on such inaccuracies as [Plaintiff's] illiteracy," *id.*, and observed that Dr. Sher acknowledged Plaintiff's lack of a diagnosed learning disability.

Plaintiff contends that the ALJ failed to provide "good reasons" for discounting Dr. Sher's opinions, and further failed to consider the six factors required under the regulations when a treating opinion is afforded less than controlling weight. *See* 20 C.F.R. § 404.1527(c)(2)-(6). The Commissioner responds that ALJ Merrill properly

discounted Dr. Sher's opinions because a disability determination is properly reserved to the Commissioner and because Dr. Sher's other opinions were not supported by objective clinical or laboratory data and were contradicted by other evidence in the record.

"[S]ome kinds of findings – including the ultimate finding of whether a claimant is disabled and cannot work – are 'reserved to the Commissioner.'" *Snell*, 177 F.3d at 133 (quoting 20 C.F.R. § 404.1527). "That means that the [SSA] considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." *Id.* ALJ Merrill properly rejected Dr. Sher's June 10, 2014 treatment note which reflected his belief that Plaintiff is "unable to work." (AR at 553.)

Other opinions offered by Dr. Sher are properly characterized as assessments of Plaintiff's functional limitations such as Plaintiff's inability to perform physical labor. Because the ALJ provided "good reasons" for discounting these opinions, there was no error in rejecting them. For example, ALJ Merrill noted discrepancies between Dr. Sher's assessment that Plaintiff cannot perform physical labor and substantial record evidence demonstrating Plaintiff's ability to walk, sit, stand, and lift moderate weight. The ALJ also observed that Dr. Sher's functional assessment was directly contradicted by Dr. White's assessment and Dr. Rossman's consulting examination.

ALJ Merrill's conclusion that Dr. Sher's opinions were entitled to no weight may have been colored by an inaccurate view of Plaintiff's illiteracy and by ascribing an improper motive to Dr. Sher based on pure speculation. *See* AR at 32-33 (discounting Dr. Sher's opinion "in part on such inaccuracies as the claimant's illiteracy" and "in order to satisfy [his] patient['s] requests and avoid unnecessary doctor/patient tension.").[6] Because "the ALJ cannot arbitrarily substitute his own judgment" when evaluating a treating physician's medical opinion, on remand a different ALJ should reconsider what

---

[6] Although ALJ Merrill suggested that Dr. Sher may have harbored improper motivations while formulating his opinions, such as facilitating the disability application for a patient with whom he sympathized, there is no evidence to support this claim which appears to be rank speculation.

weight, if any, to give to Dr. Sher's opinion only after Plaintiff's illiteracy or lack thereof is determined. *Rosa*, 168 F.3d at 79.

### D.  Whether the ALJ Erred In Assessing Plaintiff's Depression.

Plaintiff contends that the ALJ erred at Step Two in concluding that she does not suffer from a severe mental impairment related to her depression. In support of her argument, Plaintiff maintains that Dr. Patalano determined that she suffers from an affective disorder that qualifies as a severe impairment. She further contends that Dr. Sher noted worsening psychological symptoms subsequent to Dr. Patalano's consulting assessment and observes that she pursued mental health treatment as a result. As the Commissioner points out, Plaintiff was discharged from mental health care on January 30, 2015 with a "stable mood" and the feeling that "she had met the treatment goals that had brought her to therapy[.]" (AR at 703.) Ms. Culver and Ms. Ambroz both advised Plaintiff to seek vocational rehabilitation and opined that working might benefit her psychological symptoms. Finally, ALJ Merrill considered Dr. Patalano's assessment that Plaintiff "may have episodic[] problems with concentration/pace due to episodic increases in depression associated with health and environmental stressors" when determining the severity of Plaintiff's depression. (AR at 89) (capitalization omitted).

Although an "'ALJ cannot arbitrarily substitute his own judgment for competent medical opinion[,]'" *Rosa*, 168 F.3d at 79 (quoting *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)), the court may "'set aside [an] ALJ's decision only where it is based upon legal error or is not supported by substantial evidence.'" *Id.* (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)). Reversal is warranted only in those circumstances where the ALJ "set his own expertise against that of a physician who [submitted an opinion to or] testified before him[.]" *Balsamo*, 142 F.3d at 81.

ALJ Merrill considered Dr. Patalano's assessment as required by the regulations, but found that Plaintiff's "medically determinable impairment of depression does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore non[-]severe." (AR at 27.) Substantial record evidence

supports this conclusion, and contrary to Plaintiff's contentions, the ALJ's finding is not wholly inconsistent with Dr. Patalano's determination. Dr. Patalano noted that Plaintiff had "chronic depression" but "strong" ADLs. (AR at 84) (capitalization omitted). There was therefore no error in the ALJ's determination that Plaintiff does not suffer from a severe mental impairment related to her depression. On remand, the ALJ is nonetheless required to include any non-severe limitations in his or her consideration of Plaintiff's RFC. *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "'severe[.]'").

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion for an Order reversing the Commissioner's decision (Doc. 9) and DENIES the Commissioner's motion to affirm (Doc. 15). ALJ Merrill's decision is VACATED and the matter is REMANDED to the Commissioner for a new hearing before a different ALJ to determine whether Plaintiff is illiterate, to re-evaluate Dr. Sher's treating physician opinion, and to re-consider Plaintiff's RFC.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 10ᵗʰ day of August, 2018.

Christina Reiss, District Judge
United States District Court